UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SAGI BARZILAY,                          )
                                        )
            Plaintiff,                  )
                                        )
    vs.                                 )          Case No. 4:07CV01781 ERW
                                        )
TAMAR BARZILAY,                         )
                                        )
            Defendant.                  )

## MEMORANDUM AND ORDER

This matter comes before the Court in response to an Opinion issued by the Eighth Circuit

Court of Appeals on August 4, 2008, reversing this Court's previous Order and remanding the

matter back to this Court for determination of the merits of the issues raised in Plaintiff's Verified

Petition for Return of Minor Children, Access to the Minor Children, and Issuance of Show

Cause Order [doc. #1], brought pursuant the Hague Convention.  After additional discovery was

completed as ordered by this Court, the Parties submitted briefs [doc. #43, #44, and #45],

detailing the issues to be addressed at an Evidentiary Hearing.  An Evidentiary Hearing was held

on December 12, 2008, and the Hearing concluded with Oral Argument by counsel for both

Parties.

## I.    FINDINGS OF FACT

This case involves a dispute concerning the custodial rights of Sagi Barzilay ("Plaintiff")

and Tamar Barzilay ("Defendant") to their three children.  Plaintiff and Defendant are Israeli

citizens who have lived in Israel, the Netherlands, and the United States, where they came in late

January 2001, on work visas through their employer, AmDocs.  Prior to arriving in the United

States, they had one child, S.B., who was born in Israel on July 12, 1996. Their second child, I.B., born January 22, 2002, and their third child, A.B., born July 9, 2004, were both born in the United States. The eldest child has Israeli citizenship, while the two younger children have dual Israeli and American citizenship.

Plaintiff filed a petition for dissolution of the Parties' marriage in the Circuit Court of St. Louis County. Thereafter, on November 10, 2004 and November 11, 2004, respectively, Defendant and Plaintiff entered into an eleven-page Separation Agreement that adopted, by reference, a comprehensive Parenting Plan, which provided detailed arrangements for child custody, parental responsibility and visitation. The Parties agreed to "joint legal custody and shared physical custody," noting, "[h]owever, the parties agree that the best interest of the child(ren) at this time is that primary parental responsibility and physical custody of the minor child(ren) will be in Wife [Defendant] subject to the visitation rights of Husband [Plaintiff]." (Pl. Ex. P-1, Parenting Plan pp.1-2). The Parenting Plan provided for expansive visitation privileges for Plaintiff. The Parties' marriage of October 11, 1994, officially ended on November 28, 2005.

Plaintiff believes that a particular clause in the Parenting Plan is dispositive in ruling the matter before the Court. The Parenting Plan provides for certain action of a party in the event either Party should move back to Israel:

> Both of the parties are citizens of the State of Israel and have family who continue to reside thereat. In addition, the parties are residing in the United States on an immigration status which could result in either or both of them being required to leave the United States on relatively short notice. Both parties agree that it is in the best interests of the children that they have a close and continuing relationship with the other parent. Consequently, they have agreed that in the event that Wife leaves Missouri to return to the State of Israel that she may remove the children from Missouri for this purpose, Husband hereby giving his permission in advance for her to do so, and regardless whether such move is voluntary or involuntary on her part.

In the event either party leaves Missouri to return to the State of Israel, and regardless of whether such move is voluntary or involuntary on her or his part, the other party shall forthwith take such steps to move back to Israel so that Husband and Wife and the children shall reside within the same country. During such period of time that one party has returned to Israel and the other party has not yet returned, if so, each party shall provide the other parent with reasonable and repeated telephone contact with the children at all reasonable times and, in addition, Wife shall solely bear the cost of (i) either transporting the children to and from Israel and the United States for visits with Husband as they may agree or if there is no agreement then by court order or (ii) transportation costs for the Husband to visit with the children in the United States or the State of Israel, as the case may be. Such trips by the children or Husband, as the case may be, shall not be less frequent that one visit per month.

(Pl. Ex. P-1, Parenting Plan pp.10-11).

In September 2005, Plaintiff moved back to Israel. Shortly thereafter, Plaintiff began inquiring of Defendant's intent to relocate to Israel. Plaintiff testified that Defendant "avoid[ed] giving a straight answer of when," and told him that she did not know what she would do there and that a move to Israel would not be good for the children. (Hrg. Tr. p.31). Plaintiff recognizes that after he departed from the United States, Defendant made changes in her life, including having a new boyfriend, who eventually became her husband. Plaintiff continued to visit the children in St. Louis regularly, pursuant to the Parenting Plan, with Defendant providing the cost of airfare for such visits. In June 2006, after visiting the children in St. Louis, Plaintiff took the children, by agreement, to Israel for a summer visit. Before the trip, Plaintiff and Defendant had a discussion about its purpose and duration. According to an agreed plan between the Parties, the children would fly to Israel with Plaintiff, while Defendant and her boyfriend (now husband), would travel to Israel for a month-long vacation. Defendant, her companion, and the children were to leave from Israel and fly to the United States on July 9, 2006, with Plaintiff

saying "goodbye" at the airport. During the June visit in Israel, the children were to visit both with Plaintiff and his family and with Defendant and her family.

Although Plaintiff and Defendant had agreed that the children would return with Defendant to the United States on July 9, 2006, Plaintiff sought *ex parte* relief in the Family Court in Kfar Saba, Israel on July 3, 2006, requesting a Stay of Exit of Minors. Plaintiff argued to the Israeli court that the divorce decree in the St. Louis County court and the Parties' Separation Agreement and Parenting Plan required the spouse remaining in Missouri, upon relocation of the other spouse to the State of Israel, to relocate to the State of Israel with the children within 180 days, so that the parents and children would all live in the State of Israel. This allegation to the Israeli court was not factual, as neither the St. Louis County decree nor the Parties' Separation Agreement and Parenting Plan had a 180-day time requirement, rather the Parenting Plan required relocation "forthwith." (Pl. Ex. P-1, Parenting Plan p.11). Plaintiff further averred to the Israeli court that the Parties intended that Israeli law should apply because the Parties intended to return to Israel and not remain in the United States. However, no reference to choice of law language is found in the St. Louis County Family Court Judgment, the Parties' Separation Agreement, or the Parties' Parenting Plan.

Additionally, Plaintiff did not comply with the plain language of the Family Court Judgment of the Circuit Court of St. Louis County. The Relocation Notice provision included in the St. Louis County Family Court Judgment states:

> Absent exigent circumstances as determined by a court with jurisdiction, you, as a party to this action, are ordered to notify, in writing by certified mail, return receipt requested, and at least sixty days prior to the proposed relocation, each party to this action of any proposed relocation of the principal residence of the child(ren), including the following information: (1) the intended new residence, including the

specific address and mailing address, if known, and if not known, the city; (2) the home telephone number of the new residence, if known; (3) the date of the intended move or proposed relocation; (4) a brief statement of the specific reasons for the proposed relocation of the child; and (5) a proposal for a revised schedule of custody or visitation with the child. Your obligation to provide this information to each party continues as long as you or any other party by virtue of this order is entitled to custody of a child covered by this order. Your failure to obey the order of the court regarding the proposed relocation may result in further litigation to enforce such order, including contempt of court. In addition, your failure to notify a party of a relocation of a child may be considered in a proceeding to modify custody or visitation with the child. Reasonable costs and attorney fees may be assessed against you if you fail to give the required notice.

(Pl. Ex. P-1, Family Court Judgment p.1). Plaintiff testified that he was not initially aware of the notice requirement contained within the Dissolution Decree concerning repatriation, but stated at the hearing that he is now aware of the requirement. No notice was ever sent to Defendant before Plaintiff sought relief on July 3, 2006, in the Israeli court. Thus, although Plaintiff did not comply with the provisions of the judgment of the court which had jurisdiction over the custodial rights of the Parties,[1] he nevertheless represented to the Israeli court that Defendant failed to comply with the Parenting Plan clause requiring repatriation to Israel, arguing that such failure subjected him to irreparable harm without Israeli court intervention.

Plaintiff was persuasive in the Israeli court, and an *ex parte* Stay of Exit Order was served on Defendant on July 4, 2006. Plaintiff retained the children's passports over the objection of Defendant, thereby preventing them from returning to the United States, so Defendant retained

---

[1]The Circuit Court of St. Louis County had jurisdiction over the custodial rights of the Parties pursuant to the Uniform Child Custody Jurisdiction Act, adopted in Missouri in Mo. Rev. Stat. §§ 452.440-452.550. *See* Mo. Rev. Stat. § 452.450.1(1)(a) ("A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if this state is the home state of the child at the time of commencement of the proceeding."; Mo. Rev. Stat. § 452.445(4) ("'Home state' means the state in which, immediately preceding the filing of custody proceeding, the child lived with his parents, a parent, an institution, or a person acting as parent, for at least six consecutive months . . . .").

Israeli counsel, and an off-record court proceeding followed.  According to Defendant, she feared

that she would lose her job if she did not return to the United States as planned, so she signed a

Consent Agreement.  The four-page Consent Agreement, approved by both Parties in Israel on

July 9, 2006, provided, in part, that Defendant and the minor children would repatriate and dwell

in Israel between July 9, 2006 and August 1, 2009, the same being an irrevocable commitment by

Plaintiff, Defendant and the minor children, although the children had no separate legal

representation.  The Consent Agreement further provided that failure to timely return the minors

to the State of Israel would be "regarded as kidnapping as stated in The Hague treaty, except

delay caused by force majeure (until the removal of such force majeure)."  (Pl. Ex. P-2, pp.2-3)

The Consent Agreement also provided that Defendant would not file a petition outside the

State of Israel:

> The mother and her partner are obligated not to file a petition with the court in
> Missouri or in any other place outside the state of Israel, in all the matters mentioned
> herein, the petition shall be to the court in the state of Israel.  It is agreed in advance
> that every petition in regards of the minors filed with the court in Missouri or any
> other court outside the state of Israel, shall be transferred to a court in the state of
> Israel for sitting.

(Pl. Ex. P-3, p.2).  The Consent Agreement further provided that "[t]he sole and only

international authority in regards to the minors' immigration, repatriation and custody shall be the

authority of the court in Kfar-Saba" and that "[e]very change to [the] agreement that was not

agreed by both parties can be asked for only in the state of Israel and only after the minors have

returned to dwell in Israel . . . ."  (Pl. Ex. P-3, pp.2-3).

The Consent Agreement also provided that Defendant would be liable for a $200,000.00

bond, obligating both herself and her father to assure compliance with the Agreement.

Specifically, Defendant became "self-liable to pay" Plaintiff $100,000.00 and Defendant's father became liable to pay an additional amount of $100,000.00. The Consent Agreement also stated that "[a]n injunction shall be placed on the mother's father retirement funds, on [sic] the amount of $100,000 . . . ." (Pl. Ex. P-2, pp.3-4).

The Consent Agreement was approved on a "Verdict" by Judge Rivka Mekaiis on July 10, 2006. (Pl. Ex. P-2, p.1). Upon signing the Consent Agreement, Defendant acquired the children's passports from Plaintiff and returned with her companion and the children to the United States. She now claims that she signed the Agreement under duress in order to return to the United States with her children as planned.

Notwithstanding the terms of the Consent Agreement, on June 6, 2007, Defendant filed a motion to modify the original Decree of Dissolution of Marriage in the Circuit Court of St. Louis County, Family Court Division, requesting a change in custodial arrangements based on changed circumstances. In her motion, Defendant sought to restrict Plaintiff's visitation rights, to remove the Parenting Plan clause requiring repatriation to Israel, and to have the court hold Plaintiff in contempt of court. The eighteen-page motion also requested other relief. (Pl. Ex. P-4). Thereafter, on July 3, 2007, Plaintiff made a request for relief in the Kfar Saba Family Court in Israel. In ruling on Plaintiff's request, Judge Rivka Mekaiis instructed Defendant "to act for the minors arrival to Israel for a visit between from July 10, 2007 and August 10, 2007." The Judge also forbade Plaintiff from "issuing a departure prevention warrant both against the minors and against the mother in any court and in any way including via a third party." Judge Mekaiis further ruled that "[i]n case of a violation of the stated above by the mother, I instruct that for every day

of violating of this decision the mother will pay a fine of $600 per a day of violation of this decision of mine above." (Pl. Ex. P-3, pp.4-5).

On October 18, 2007, Plaintiff filed a Verified Petition for Return of Minor Children, Access to the Minor Children and Issuance of Show Cause Order in this Court [doc. #1]. The petition was "brought pursuant to the [Hague] Convention on the Civil Aspects of International Child Abduction, done at The Hague on 25 October 1980 (the 'Convention') and 42 U.S.C.§ 11603(b), The International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601, et. seq. (2001)." Plaintiff sought to gain physical custody of the children for the purpose of returning them to Israel. (Pl. Ex. P-7). This Court initially abstained, based on its determination that the state court (in this case, the Circuit Court of St. Louis County, Family Court Division) had already been presented with a Hague Convention claim [doc. #15]. However, the Eighth Circuit held that the Hague Convention issues were not adequately raised in the state court proceedings and that this Court was in error and should not have abstained [doc. #29].

When the Parties were litigating in Israel in July 2006 over the *ex parte* Stay of Exit Order that was served on Defendant, Plaintiff withdrew any request he initially made in the Kfar Saba Family Court for relief under the Hague Convention. Judge Mekaiis did not make any findings under the Hague Convention and gave the Consent Agreement reached by Plaintiff and Defendant the "status of a verdict", stating that "all issues brought in front of me [are] resolved." (Pl. Ex. P-2, p.1). Additionally, although the Circuit Court of St. Louis County referenced the "habitual presence" of the children in its October 16, 2007 Order, no definitive ruling was made by that court on the identity of the habitual residence of the three minor Barzilay children under the Hague Convention. That responsibility now falls to this Court. Plaintiff believes that the

conclusion may be easily embraced by enforcing the Parenting Plan language calling for "forthwith" repatriation to Israel. Defendant, on the other hand, argues that two of the three children were born in and have always lived in the United States, and that their eldest child has lived in the country for a approximately eight years.[2] Therefore, Defendant maintains that the habitual residence of all three children is the United States of America. The resolution of the issue must be fact-specific to this individual case.

Plaintiff testified that when he filed for an *ex parte* Stay of Exit Order in the Israeli court, he was trying to enforce the Parenting Plan clause requiring repatriation to Israel. He admitted that the clause does not provide for repatriation within 180 days, as represented to the Israeli court, but stated that the 180 days provision was in an unsigned draft of the Parenting Plan. He also testified that, when he filed the petition in the Israeli court, he recognized that the children were residents of Missouri and that they had never attended school in Israel. In response to a question regarding whether he believed that the Israeli Judge could change the residency of the children, considering that they had not physically lived in Israel before July 2006, he said "[b]ack then, no." (Hrg. Tr. p.84-85). Regardless, he does not agree that the habitual residence of the children is Missouri, and he testified that he has this belief because of the repatriation agreement.

Plaintiff is vague about when he formed his plan to seek relief in the Israeli court to keep the children in Israel. When asked why he did not request relief in the Circuit Court of St. Louis County when he picked up the children in Missouri to take them to Israel, he said that at that time he had not made up his mind. He said that he did make up his mind after he returned to Israel

---

[2]S.B. was born in Israel and obviously resided in the State of Israel for some period of time, although the duration is unknown, as the facts presented to this Court suggest that the Parties also lived in the Netherlands before coming to the United States.

with the children. Based on his testimony, it is undisputed that he took possession of the children's passports and decided to file for relief in the Kfar Saba Family Court rather than the St. Louis Circuit Court, because he believed that he had a better chance to prevail in the Israeli Court.

It is clear from an e-mail exchange between the Parties that Plaintiff believed that he could force Defendant and the children to move back to Israel because of the Parenting Plan clause requiring repatriation to Israel, and that Defendant concluded some time after the dissolution of the Parties' marriage that she had no intention of moving back to Israel. Plaintiff wrote the following in an email to Defendant on March 4, 2006:

> Hello,
> I'd like to summarize our current situation first and then propose a new visitation agreement, one that will better focus on the kids best interests and my interests, as a parent, as well.
>
> We had agreed, while we were discussing divorce details, that after one of us repatriates to Israel, willingly or not, the other parent will repatriate to Israel within 180 days. I have repatriated on September 16, 2005 and according to that understanding we shared, you were supposed to repatriate until March 15, 2006. Last month we discussed this understanding over the phone and you clearly stated that you do not intend repatriating to Israel in March 2006, or in June 2006 (after school year is over); and that the earliest time you think you may consider repatriation is June 2007. Your repatriation refusal is a clear violation of the existing agreement.
>
> The visitation agreement, we both had signed as part of the divorce decree, emphasizes the visitation agreement's transient nature in our decree: until both parents and children reside in the same country - as this is in the best interest of the children.
>
> As you do not intend repatriating or transferring custodial duties to me, we must work out a different visitation agreement that will provide the children with sustained and meaningful relationship with me as their father. It is not reasonable to enforce the decree's minimal generic visitation schedule as it does not address parents living in two different countries with 2,000 miles and 18 hours one-way trip between one parent and the children.

My proposal is aggregating all visitation days into two consecutive periods, while I continue coming for visits about once a month between those periods. All three children will come to Israel for each period. The periods are two weeks during winter break and eight weeks during summer break. The most restrictive school calendar, such as Parkway, will be the guide for setting up the exact dates. You will continue be the sole financial responsible party for the children's visits in Israel and my visits in the United Sates [sic] until the children's repatriation to Israel. We will include in the visitation agreement a section of assurances/penalties, monetary and/or others, to be used in case of agreement breaching.

I want to finish everything and have a signed visitation schedule agreement between us until April 2, 2006. I expect your response by the end of this week (March 10) the latest, so we can reach a signed agreement by April 2, 2006.

Sagi.

Defendant responded on March 7, 2006:

The agreement says that in case you return to Israel, I will have to pay for your trips back here at a frequency of every four weeks. Essentially, once a month or 12 times a year.

In my proposal to you, I offered to pay for visits that occur every 3 weeks or the equivalent of up to 15 trips a year. In addition to that, I offered to bring the kids to Israel in the summer. So, that proposal does offer more time than the standard or "minimal" visitation schedule in the divorce agreement.

I honestly do not believe it's good for the kids (especially [I.B.] and [A.B.]'s ages) to be away from me and their routine for a period of 8 weeks. I believe that it is reasonable to talk about them going there 1 week before I go visit. I think that if [S.B.] would like to stay longer, we can consider it.

Finally, I am happy to work with you to set timelines to finish with this discussions, but these dates need to be agreed on just like the visitation discussions.

Tammi.

(Pl. Ex. P-9). Then, on March 23, 2006, Defendant wrote to Plaintiff:

I am sorry that the call last Sunday didn't work so well. [S.B.] was talking to my parents on the phone, and there was a lot going on at the house.

And, I regret that we have such different opinions on many of these points. We need to concentrate on what is best for the kids.

You are correct that we have different thoughts about the impact on the kids if they spend 8 weeks of the summer in Israel. I know you are capable of taking care of them, but you will not be spending the days with them. You did take care of them by yourself in the US, but those times lasted a few days, their daily routine was familiar to them, and they typically saw me even while they were at your house. Even then the transitions were difficult on [I.B.] and she usually wanted to be back at my house within a day or two. At young ages, it is extremely difficult for them to be away from their mother for a long period of time.

Everything in their routine will change if they are in Israel for 8 weeks, and I don't think the kids are at an age where they can deal with that type of change well.

They will be in a completely new day care and environment with almost nothing that is familiar to them. This should be about what is best for them. That type of very large change. The travel, the new daycare, the new house, bedroom, people, and places will all be new. Even if [I.B.] might not be crying every day after 8 weeks, it will be time to change it all again. That cannot be what is best for kids their age.

Finally, choosing a random date for a return to Israel is not a good decision.

Moving anywhere is a major decision with many things to consider. That type of major change should not be made simply because a day on the calendar comes around. I need to consider the impact on the kids, my job here and any possible jobs there, and the financial impact of a move among many other things.

The kids have been through very big changes over the last couple years. They are in a stable, safe, and good routine right now. They like their schools and have good friendships. My job offers very good hours, especially for how much it pays. Deciding whether or not to disrupt that needs to be more than a random choice.

Let's try to come up with another option for visiting that we can both feel ok about.

(Pl. Ex. P-10). On April 19, 2006, Plaintiff wrote to Defendant:

Hello,
This is what we have now and this is also what we do not agree on.

1. The existing decree states that you should take steps to immediately repatriate to Israel in case I voluntarily or involuntarily leaves the US and repatriates to Israel.

You did not do that and you do not plan on doing that.  This is a clear violation of the decree you signed yourself.

2.  It is paramount to our continuing discussions that you provide a repatriation date as every alteration we will do depends on that date.  You did not and do not provide such a date.  We can achieve no progress.

3.  You have proposed to finance 15 trips a year for me alone (not including kids).  This is not different than what the existing decree states.

4.  You proposed that the kids will have a two weeks visit in Israel every year.  This is not different from the visits done in the past when we were married and until now when we are divorced.

5.  The contact the children have with their father is not even close to what can be called a "reasonable meaningful relationships."

6.  Best of my recollection, I have made several suggestions in order to make some progress.  You have rejected them all and did responded by bringing up the same agreement elements we already have.

Please feel free to add or comment on any item.

From my point of view, we are in disagreement in every point and we are getting nowhere.  Where do you see an opening for continuing fruitful discussion?

Sagi.

(Pl. Ex. P-11).  Thereafter, the Parties continued to correspond by e-mail, restating their positions, with no resolution of their dispute.

It is clear that each of Parties in this case has documented changes of intentions. Defendant executed an agreement that required that she "forthwith" repatriate with the children to Israel.  At some time after the dissolution of the Parties' marriage, however, Defendant decided to remain in the United States with the children.  There is no evidence, nor any logical inferences that can be drawn from the evidence, that suggests that she secretly harbored thoughts of remaining in the United States at the time she executed the Parenting Plan.  As for Plaintiff, he testified that he did not seek relief in the Circuit Court of St. Louis County, the court where he filed the petition for dissolution of the Parties' marriage, even though he was in Missouri when he picked up the children for the purpose of taking them to Israel for vacation.  He said that it was

13

not until he arrived in Israel that he decided to seek relief in the Israeli court, admittedly in hopes of changing the Missouri court judgment. This Court cannot say that Plaintiff was acting deceitfully when he sought relief in Israel instead of the United States, but he does confess that he sought relief in Israel because he had a better chance to win there. Plaintiff also admits that he did not comply with the notice provision of the St. Louis County Judgment, and argues that the "forthwith" term in the repatriation clause means "immediately," without recognizing the words, "take such steps to move back to Israel . . . ," which follow the word "forthwith" in the Parenting Plan. Taking steps to accomplish a task can mean significantly more than its immediate execution.

The Court will now turn to the task of determining the habitual residence of the children.

## II. CONCLUSIONS OF LAW

In 1980, a group of countries participated in and adopted the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"). Although the United States did not participate in the actual proceedings, it ratified the Convention in 1988, by enacting the International Child Abduction Remedies Act ("ICARA"). 42 U.S.C. § 11601-11611 (1988). The stated purpose of the Convention was "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention on the Civil Aspects of International Child Abduction art. 1, Oct. 25, 1990, 19 I.L.M. 1501. In carrying out this stated purpose, the Convention provides for the return of a child who has been "wrongfully removed" from the country in which he or she is a habitual resident. *Id.* arts. 3, 12. The removal of a child is considered to be "wrongful" when it is in breach of the custody rights of another person and when those custodial rights were actually being

exercised at the time of the removal, or would have been exercised but for the removal. Custodial rights, and any breach thereof, are determined under the law of the country that is determined to be the child's habitual residence.[3] *Id.* art. 3.

As noted by the Eighth Circuit, "[t]he key inquiry under the Convention is whether a child has been wrongfully removed from the country of its habitual residence or wrongfully retained in a country other than that of its habitual residence." *Barzilay v. Barzilay*, 536 F.3d 844, 847 (8th Cir. 2008). In determining whether a child was wrongfully removed under the Convention, a court is to address a series of four questions, initially set forth by the Ninth Circuit and subsequently adopted by many other courts, including the Eighth Circuit. These questions are:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001); *see also Barzilay*, 536 F.3d at 847. The Court will address these issues in the sections that follow.

---

[3]The Convention distinguishes between "rights of custody" and "rights of access." The former refers to the "rights relating to the care of the person of the child," and specifically requires the person asserting custody to possess "the right to determine the child's place of residence." The latter, however, refers to "the right to take the child for a limited period of time to a place other than the child's habitual residence." *Id.* art. 5. Rights of custody are assigned greater protection under the Convention than are rights of access; the Convention provides for the return of the child to his or her habitual residence in cases involving rights of custody, but in cases involving rights of access, the Convention only requires a country to take "steps to remove, as far as possible, all obstacles to the exercise of such rights." *Id.* arts. 12, 21; *see Gonzalez v. Gutierrez*, 311 F.3d 942, 948-49 (9th Cir. 2002).

**A.      WHEN DID RETENTION AT ISSUE TAKE PLACE?**

Plaintiff is alleging that the children were wrongfully retained within the United States when Defendant failed to repatriate with the children.  Plaintiff's wrongful retention claim is based on Defendant's alleged failure to comply with the requirement that she "forthwith" repatriate with the children to Israel, following his repatriation in September 2005.  Because the "forthwith" requirement does not establish a finite deadline by which Defendant was to have moved to Israel with the children, it is difficult to ascertain the precise point in time at which the alleged wrongful retention occurred.  Further, Plaintiff has not set forth a specific date or time at which he asserts that the alleged wrongful retention began.  Rather, at the Evidentiary Hearing held by this Court on December 12, 2008, Plaintiff testified as follows:

> Q      You claim in your federal complaint that there was a wrongful retention of the children by [Defendant].  Is that correct?
>
> A      That is correct. . . .
>
> Q      Are you claiming that the wrongful retention occurred before you filed your Israeli petition in July of 2006?
>
> A      Yes.
>
> Q      On what date did the wrongful retention occur?
>
> A      I don't have a specific date.  It's evolving.

(Hrg. Tr. p.83).  Based on this testimony by Plaintiff, it is clear only that the alleged wrongful retention took place at some point between Plaintiff's repatriation to Israel in September 2005 and Plaintiff's filing of the Israeli petition in July 2006.

At least one case has suggested that "a child is not retained under the Convention until a parent unequivocally communicates his or her desire to regain custody."  *Karkkainen v.*

*Kovalchuk*, 445 F.3d 280, 290-91 (3d Cir. 2006) (holding that it was clearly erroneous for the District Court to find that Plaintiff had not clearly communicated her opposition to the child's presence in the United States until she filed the petition for return). Although it is not clear from the evidence in this case precisely when Plaintiff unequivocally communicated to Defendant that he wanted her to repatriate to Israel with the children, it is clear that the Parties were directly confronting the issue by the early Spring of 2006. The Court makes this conclusion for several reasons First, Plaintiff testified that after he repatriated in September 2005, the Parties put the issue "on hold" until "about the end of April or so, 2006." (Hrg. Tr. p.31). Second, in an email from Plaintiff to Defendant dated March 4, 2006, Plaintiff recognized that Defendant did not intend to repatriate and asserted that "[her] repatriation refusal is a clear violation of existing agreement." (Pl. Ex. P-9). Following this March 4, 2006 e-mail, the Parties exchanged additional e-mails, which further discussed Plaintiff's desire for Defendant to repatriate and Defendant's desire to remain in the United States. (Pl. Ex. P-10 - P-13) Thus, it appears that Plaintiff had unequivocally communicated to Defendant that he wanted her to repatriate to Israel with the children by the early Spring of 2006. As a result, for the purposes of determining the issue of wrongful retention, the Court finds that the alleged wrongful retention occurred in the early Spring of 2006.[4]

---

[4]In determining the place of the child's habitual residence under the Hague Convention, the analysis of when the alleged wrongful removal or retention occurred is important. Specifically, the Convention provides that the *only* relevant point in time for determining habitual residence is "immediately before the removal or retention." *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (citing Hague Convention on the Civil Aspects of International Child Abduction, art. 3, Oct. 25, 1990, 19 I.L.M. 1501). In this case, no changes were made to the living arrangements of the children or to the Parties' custodial agreement between the time that Plaintiff repatriated to Israel in September 2005 and Plaintiff's filing of the July 2006 Israeli action. Because no significant changes were made during this time, it is not imperative that this

**B.** **WHERE DID THE CHILDREN HABITUALLY RESIDE IMMEDIATELY PRIOR TO RETENTION?**

Having concluded that the alleged wrongful retention took place in the early Spring of 2006, the Court must now ascertain where the Barzilay children were habitually residing immediately prior to that time.  Although the Convention places great significance on the place of the child's habitual residence, it does not provide a precise definition or explanation of what is meant by the term.  In its order reversing and remanding this case, the Eighth Circuit noted that

> [t]he determination of a child's habitual residence presents mixed questions of law and fact and requires the analysis of many factors, including the settled purpose of the move to the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child to the new country.

*Barzilay v. Barzilay*, 536 F.3d 844, 851-52 (8th Cir. 2008) (citing *Silverman v. Silverman*, 338 F.3d 886, 897-98 (8th Cir. 2003); *Mozes v. Mozes*, 239 F.3d 1067, 1071-81 (9th Cir. 2001)). Each of these factors will be addressed in turn.

**1.** *Settled Purpose of the Move to the New Country from Child's Perspective*

The Eighth Circuit has recognized that a child's "'habitual residence' must encompass some form of 'settled purpose.'" *Silverman*, 338 F.3d at 898 (citing *Feder v. Evans-Feder*, 63 F.3d 217, 222-23 (3d Cir. 1995)).  While the settled purpose "need not be to stay in a new location forever," there must be a "'sufficient degree of continuity to be properly described as settled.'"  *Id.* (quoting *Feder*, 63 F.3d at 223).  Further, the issue of settled purpose must be examined from the perspective of the child, although the intent of the parents is relevant.  *Id.* (citing *Feder*, 63 F.3d at 222).

---

Court discern the precise date on which the alleged wrongful retention occurred.

In this case, there is no question that, from the perspective of the Barzilay children in early Spring of 2006, the settled purpose of their time in the United States had been to permanently reside there. As of that time, two of the children had been living in the United States for their entire lives, and the eldest child had been residing in the country for more than five years. It is unclear from the facts presented in this case whether the family made any trips to Israel prior to the early Spring of 2006, as the only trip discussed in the briefs and the evidentiary hearing was the trip made in June and July of 2006. However, because the families of both Parties lived in Israel, it is possible that the family occasionally visited the country. Nevertheless, any such trips would not affect the children's perspective because they cannot realistically be considered to be anything more than a mere temporary stay or vacation. Further, all of the school-age children had been attending school solely in the United States; none of the children have ever attended school in Israel. The children have known no home other than the United States, thus, it is clear that, from their perspective in the early Spring of 2006, they were permanently settled in the United States, and not in Israel.[5]

### 2.      *Parental Intent*

The issue of parental intent is more complicated. As noted by the Ninth Circuit, "[d]ifficulty arises . . . when the persons entitled to fix the child's residence no longer agree on where it has been fixed - a situation that, for obvious reasons, is likely to arise in cases under the Convention." *Mozes*, 239 F.3d at 1076. Cases involving the issue of parental intent can generally

---

[5]It is important to note that none of these factors have changed since the early Spring of 2006; the children are still living permanently in the United States and are still attending school solely in the United States. Thus, even if the Court were considering habitual residence at the present time (instead of at the time of the alleged wrongful retention), the conclusion regarding the settled purpose from the perspective of the children would be the same.

be divided into three categories. The first category encompasses "cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move." *Id.* In these cases, courts "are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose," and, thus, usually find that habitual residence has been established in the country to which the family moved. *Id.* at 1077. The second category includes "cases where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period." *Id.* In these cases, courts generally find that the habitual residence of the child never changed and remains in the initial established habitual residence, regardless of the changed intentions of one of the parents. *Id.* The final category involves "cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration." *Id.* In these cases, the outcome depends on whether the circumstances surrounding the stay abroad suggest that there was a settled intent among both parents that the stay would last indefinitely or whether they suggest that the parents left the issue of length of stay open to negotiation without mutual agreement. In the former situation, courts are likely to find abandonment of the child's prior habitual residence, while in the latter, courts are much less likely to find abandonment. *Id.*

In this case, the Parties left Israel after the birth of their first child, and moved to the Netherlands, where they remained until late January 2001. At that time, both of the Parties obtained temporary work visas through their employer, AmDocs, that would allow them to live in the United States, so the family moved to the United States from the Netherlands. The Parties had two more children together while they were living in the United States, where the family

remained until the Parties divorced and Plaintiff repatriated to Israel in September 2005. There is

no evidence to suggest that the Parties maintained a home or other property in Israel while they

were living in the United States, which would suggest that the Parties intended their move to be

permanent (or, to utilize the language of the first category of parental intent cases, that they had

"a settled purpose to change habitual residence"). However, the fact remains that the Parties

were in the United States on *temporary* work visas, leading the Court to believe that this case falls

into the third category of parental intent cases, those involving stays of ambiguous duration.

Thus, the issue of parental intent comes down to whether this Court finds that there was a settled

mutual intent that the stay last indefinitely. In this case, it is clear that the Parties came to the

United States without specific plans regarding the length of their stay, but that they also had no

real plans to return to Israel. Thus, the Court finds that it is reasonable to infer that the Parties

mutually abandoned any prior habitual residences when they moved to the United States on their

temporary work visas.[6] *See Sorenson v. Sorenson*, No. 08-2098, slip op. at 4-5 (8th Cir. Mar. 23,

2009) (adopting lower court's determination that parents intended to abandon prior residence

upon moving to Australia on a three year work visa, with opportunity for further work

opportunities).

Although the analysis of parental intent under *Mozes* seems to focus on the actual time of

the move, as opposed to the time immediately preceding the alleged wrongful removal or

_____

[6]Of course, it is important to note that when the Parties made the decision to move to the
United States, they only had one child. While the Court is not aware of any cases in which
children were born to the parents after moving from one country to another, it seems that the
Parties' intent to abandon any existing habitual residence in Israel is relevant with respect to all
three Barzilay children, including the two children born in the United States. It is the parent's
intent at the time of the move that is relevant in the analysis set forth in *Mozes*, irrespective of
whether the child was born at the time of the move.

retention, this Court would be remiss if it did not discuss the intentions of the Parties following

their divorce, at the time of the alleged wrongful retention in early Spring of 2006. The Parties

included in the Parenting Plan section of their Separation Agreement a clause requiring either

parent to "forthwith take such steps to move back to Israel," following the repatriation of the

other parent.[7] Although the Separation Agreement certainly suggests that the Parties understood

that repatriation to Israel might become an issue at some point in the future, the Court does not

believe that it suggests that the Parties actually intended to repatriate at a particular future point in

time. To the contrary, the Parties were acting responsibly by recognizing that they were both in

the United States on temporary work visas, and foreseeing that a dispute might arise regarding

child custody if one parent was to voluntarily or involuntarily return to Israel. It was entirely

possible, even likely, that the Parties would be allowed to stay in the United States indefinitely,[8]

and that the clause requiring repatriation would never be utilized. Thus, the Court finds that this

clause is not an expression of the settled intent of the Parties, rather it is a mere precautionary

provision in the Parties' Separation Agreement.

**3.** *Circumstances of the Child*

The remaining issues identified by the Eighth Circuit in its remand of this case are: the

change in geography, the passage of time, and the acclimatization of the child to the new country.

---

[7]This was the Agreement that was in place at the time of the alleged wrongful retention, not the Israeli Consent Agreement, which was not signed by the Parties until July 2006.

[8]At the Evidentiary Hearing, Plaintiff noted that he was not forced to return to Israel, rather, he explained that "I didn't exactly lose my employment. It was kind of an agreement that I terminated my work, and I had to come back to Israel." (Hrg. Tr. p.30). Further, according to Defendant, Plaintiff "made no attempt to obtain employment in the United States, and even declined [Defendant]'s offer of financial support to cover a U.S. job search or additional education." (Def. Pre-Trial Brief p.1-2).

These factors, all of which relate to the circumstances of the child, support a finding that the habitual residence of the Barzilay children immediately preceding the alleged retention was in the United States. As noted by the Sixth Circuit, a child's "habitual residence can be 'altered' only by a change in geography and the passage of time." *Friedrich v. Friedrich*, 983 F.2d 1396, 1401-02 (6th Cir. 1993). The Ninth Circuit further explained that "home isn't built in a day. It requires the passage of an appreciable period of time, one that is sufficient for acclimatization." *Mozes*, 239 F.3d at 1078 (internal quotations and citation omitted).

In this case, at the time immediately preceding the alleged wrongful retention, the eldest Barzilay child, the only child to have actually experienced a change in geography, had clearly been in the United States for a sufficient period of time to acclimatize. As of the early Spring of 2006, she had been in the country for more than five years, with the possible exception of a few brief visits to Israel, and had been attending school exclusively in the United States. Since the young age of five, S.B. has known no home other than the United States. By the early Spring of 2006, she had clearly been in the United States for a sufficient period of time to acclimatize to the change in geography. The two younger children have never even experienced a change in geography that would require acclimatization. They were born in the United States and have lived in the country their entire lives. Thus, it is clear that the circumstances of the Barzilay children, under this point, lead toward finding the United States to be their habitual residence.

### 4. *Conclusion Regarding Habitual Residence*

Combining all of the factors identified by the Eighth Circuit for analysis, it is clear that this Court must find the habitual residence of all three of the Barzilay children, immediately prior to the alleged wrongful retention, to be in the United States. Because the Court finds the United

States to be the habitual residence of the Barzilay children, the same country in which Plaintiff alleges that the children have been wrongfully retained, it is not necessary to continue the wrongful retention analysis. *See Barzilay v. Barzilay*, 536 F.3d 844, 847 (8th Cir. 2008) ("The key inquiry under the Convention is whether a child has been . . . wrongfully retained in a country *other than that of its habitual residence*." (emphasis added)); *Villegas Duran v. Arribada Beaumont*, 534 F.3d 142, 147 (2d Cir. 2008) ("in order to prevail on a claim under the Hague Convention, a petitioner must establish by a preponderance of the evidence that (1) the child was habitually resident in one State and then removed to or retained in *a different State* . . ." (emphasis added)). As a result, the Court can conclude at this point that there has been no wrongful retention of the Barzilay children by Defendant under the Hague Convention.

Further, this Court will not go on to address the merits of the underlying custody dispute. As instructed by the Eighth Circuit's reversal and remand of this case, the Court notes that, "[a] case arising from a petition under the Hague Convention is not a custody proceeding. A United States district court 'has authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim.'" *Barzilay*, 536 F.3d at 847 (quoting *Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir. 1999)).

## B.     ADDITIONAL CONSIDERATIONS

Although the Court's above finding that the United States is the habitual residence of the children and that Defendant did not wrongfully retain the children is sufficient to dispose of Plaintiff's Hague Petition, the Court finds it necessary to address several issues raised by the Parties in their briefs and by the Eighth Circuit in its reversal and remand of this case.

## 1.    *Effect of Israeli Court Judgments*

Large portions of the briefs submitted by both Parties focus on the various judgments issued by the Family Court in Kfar Saba, Israel.  Additionally, the Eighth Circuit noted that the judgment by the Circuit Court of St. Louis County did not include a finding of habitual residence because the state court "ignored what effect, if any, the judgments of the Israeli court should have on its analysis, including the Israeli verdict formalizing the consent agreement in which the parties agreed that Israel was the habitual residence of the children." *Barzilay*, 536 F.3d at 852.  Thus, the Court will now address the effect, or lack thereof, of the Israeli Court judgments on the Hague Convention analysis.

The Hague Convention clearly establishes that the only relevant point in time for determining habitual residence is "immediately before the removal or retention."  *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (citing Hague Convention on the Civil Aspects of International Child Abduction art. 3, Oct. 25, 1990, 19 I.L.M. 1501).  As established in the preceding analysis, the Court has found that the alleged wrongful retention at issue in this case occurred in early Spring of 2006.  However, it was not until July 3, 2006 that Plaintiff sought *ex parte* relief in the Family Court in Kfar Saba, Israel, requesting a Stay of Exit of Minors.  At the relevant point in time, there had been no judicial proceedings in the Israeli court, nor had there been any judgments issued by the Israeli court.  Thus, this Court will give the Israeli Court judgments no effect in the Hague Convention analysis.[9]

_____

[9]Even if this Court were to consider the Israeli Court judgments in its Hague Convention analysis, there are serious questions regarding the enforceability of such judgments, particularly the Consent Agreement entered into by the Parties and approved by the Israeli court as a Verdict. Specific issues identified, but not addressed by this Court include: 1) Was Defendant under duress when she entered into the Consent Agreement?  If so, does it matter that she waited more than

2.      *Did the Israeli court already address the Hague Convention issue?*

In its reversal and remand, the Eighth Circuit instructed this Court to explore whether "the proceeding in the Israeli court was brought pursuant to that country's laws implementing the Hague Convention." *Barzilay*, 536 F.3d at 852 n.1.  If the Israeli court had directly addressed the issues of habitual residence and wrongful retention and found Israel to be the habitual residence of the Barzilay children, this Court would be faced with different issues to resolve, because, "[t]o defeat attempts to relitigate custody matters in a foreign country, the Hague Convention requires contracting states to respect custody orders issued by the country of the child's habitual residence and forbids contracting states from deciding anew the underlying merits of custody orders." *Navani v. Shahani*, 496 F.3d 1121, 1129 (10th Cir. 2007) (citing Hague Convention, arts. 16, 19; *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996); *Blondin v. Dubois*, 189 F.3d 240, 248 (2d Cir. 1999)).

However, in this case, relitigation concerns do not arise because the Israeli court did not address the Hague Convention issue.  As noted in the Findings of Fact above, if there was a Hague Convention petition before the Israeli court, the request for relief was withdrawn by Plaintiff when the Parties entered into the Consent Agreement, before the issue could be addressed by the court.  Further, a review of the Verdict issued by Judge Mekaiis of the Kfar Saba

---

one year to challenge the Agreement and Verdict?  2) What effect did the misrepresentations of Plaintiff regarding time to repatriate and choice of law have on the Israeli court's decision to issue the Stay of Exit Order?  3) Did the Israeli court have jurisdiction to issue the Verdict adopting the Consent Agreement when the initial Separation Agreement and Parenting Plan was created in and adopted by the Missouri state court?  4) Is an agreement between parents regarding the place of habitual residence an enforceable contract when the children, or some of the children, have never actually resided in the place agreed upon?  Because it is not necessary for the Court to address these issues in reaching its conclusion in this matter, they will be left unanswered at this time.

Family Court reveals that the Judge did not make any findings under the Hague Convention, and yet, specifically stated that "all issues brought in front of me [are] resolved." (Pl. Ex. P-2, p.1). In addition, this Court has not been presented with any evidence to suggest that there have been any Hague Convention proceedings in an Israeli court since Judge Mekaiis's Verdict on July 10, 2006. Thus, the Court finds that there has not been a proceeding in an Israeli court that addressed the Hague Convention issue prior to the proceedings in this Court. It is also clear that the Hague Convention issue was not raised in the Circuit Court of St. Louis County, and the issue is properly before this Court for the first time.

### 3. *Forum Shopping*

Plaintiff's decision to withhold the children's passports and seek *ex parte* relief in the Israeli court, instead of in the Circuit Court of St. Louis County, clearly implicates the issue of forum shopping. Forum shopping is a topic of great concern under the Hague Convention, which seeks "to discourage a parent from engaging in international forum shopping." *Kufner v. Kufner*, 519 F.3d 33, 38 (1st Cir. 2008); *see also Tsai-Yi Tang v. Fu-Chiang Tsui*, 499 F.3d 259, 270 (3d Cir. 2007) ("the Convention was designed 'to . . . deter parents from engaging in international forum shopping in custody cases'"). Specifically, the Hague Convention attempts to prevent situations in which "a parent dissatisfied with current custodial arrangements flees with the child to another country to re-litigate the merits of custody and to obtain a more favorable custody order." *Navani v. Shahani*, 496 F.3d 1121, 1129 (10th Cir. 2007). Although the Defendant in this case is the one alleged to have wrongfully retained the children in violation of the Hague Convention, the Court finds it relevant to point out that it was *Plaintiff* who decided to retain the children's passports and seek relief in the Israeli court just days before Defendant and the children

were to return to the United States. Further, he took this course of action despite having been in the United States a mere month earlier, where he could have sought relief in the court where Plaintiff initiated dissolution proceedings and which had issued the very divorce decree he was seeking to enforce. Although Plaintiff's self-serving decision to seek relief in the Israeli court did not have any influence on the outcome of this Hague Convention proceeding *per se*, his apparent forum shopping is precisely the type of behavior condemned by the Hague Convention.

## III. CONCLUSION

The Court finds that, at the time of the alleged wrongful retention (early Spring of 2006), the habitual residence of the Barzilay children was in the United States. Because there can be no wrongful retention under the Hague Convention when the children were retained in their country of habitual residence, Plaintiff's Petition under the Hague Convention is without merit.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Petition under the Hague Convention [doc. #1] is **DENIED**.

Dated this 23rd Day of March, 2009.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE